# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

ProDox, LLC,

      Plaintiff

v.

Professional Document Services, Inc.,

      Defendant

Case No.: 2:20-cv-02035-JAD-NJK

**Findings of Fact, Conclusions of Law, and Final Judgment Following Bench Trial**

Plaintiff ProDox, LLC sues Professional Document Services, Inc. (PDS) for breaching the 2006 settlement agreement inked by these competing litigation-support-services companies by infringing on ProDox's trademark. Summary-judgment rulings left only liquidated damages for resolution at a non-jury trial. The short bench trial was surprisingly chaotic for such a narrow issue, mainly because the parties had widely disparate views of what was left for the court to decide and had been shouting past each other for years. ProDox was of the misimpression that the court had already made a ruling on how many contract violations it could collect liquidated damages for, so ProDox rested its case without putting on any evidence of the number of violations. For its part, PDS relied on the late-pled affirmative defense that the liquidated damages provision is an unenforceable penalty under Nevada law. In the end, I let ProDox reopen its case and examine PDS's CEO Kyle Lum to establish the violations, and I ordered post-trial briefing on the viability of PDS's unenforceable-penalty defense and the proper calculation of liquidated damages.

With the benefit of those post-trial briefs, I conclude that PDS waived its unenforceable-penalty defense because its failure to raise it in a timely manner materially prejudiced ProDox's ability to obtain and present evidence to prove damages. And applying the liquidated-damages

provision, I conclude that ProDox is entitled to an award of $217,500 based on Lum's testimony at trial.

**Background**

I.    **The 2006 settlement agreement limited PDS's marketing outside of California and contained a negotiated liquidated-damages clause.**

ProDox's CEO Bill Sparks started his litigation-support-services company in 2002, registered the "ProDox" trademark in 2004, and by 2006 was providing services to clients in Arizona, New Mexico, and Nevada.[1]  In 2005, ProDox began receiving calls "confusing [it] with PDS," so ProDox sent PDS a letter demanding it stop using the "ProDoc" name and eventually sued PDS for trademark infringement.[2]  In 2006, the parties resolved their dispute and signed a settlement agreement that prohibits PDS from using the ProDoc mark in any business it conducts outside of the State of California.[3]

Included in that document is a liquidated-damages clause in which ProDox and PDS agreed that, "in the event of any violation of the terms of the permanent injunction in this agreement, PDS will be liable to ProDox for liquidated damages in the amount of . . . $2,500.00 for each violation" and "a one[-]time lump payment of . . . $15,000.00" for PDS's "first violation."[4]  They also "expressly agree[d] that liquidated damages are appropriate and fully justified under the circumstances, that the amounts set forth above are fair and reasonable under the circumstances existing at this time, and that proof of the amount of actual damages would be

---

[1] ECF No. 169 at 20:20–23:21.

[2] *Id.* at 27:16–22.

[3] Pl's Trial Ex. 1 (2006 settlement agreement).

[4] *Id.* at 3–4.

difficult and burdensome for all concerned."[5]  Sparks testified that he insisted on the liquidated-damages provision to account for the reputational harm and lost profits that he saw firsthand in the preceding months.[6]  He also averred that, when the parties were negotiating the settlement agreement, his profits from clients varied, ranging from "a couple hundred bucks" for a small job to "thousands" of dollars for a larger one.[7]  Sparks added that, at the time, he believed that the violation amounts contained in the liquidated-damages provision were fair and reasonable amounts to compensate for future harm if PDS violated the injunction.[8]

## II. PDS breached the agreement, and this case proceeded to a bench trial on ProDox's contract-breach damages only.

In 2020, ProDox noticed that PDS started using the name "ProDoc | Kytel" on its website to advertise and conduct business outside of California" "sometime around 2017."[9]  ProDox then sent PDS a letter demanding that PDS "cease any further use of ProDoc | Kytel . . . on its website and URL . . . [and] immediately add the necessary disclaimer" that PDS is not affiliated with ProDox.[10]  ProDox also demanded a full accounting of any business conducted since PDS began using its infringing website[] or any other advertising that used the word [ProDoc] to target business outside of California" so that ProDox could "determine the proper and accurate extent

---

[5] *Id.* at 4.

[6] ECF No. 169 at 44:25–45:17.

[7] *Id.* at 41:11–42:6.

[8] *Id.* at 47:23–25.

[9] ECF No. 122 at 3.  Because these facts were only relevant to the liability portion of ProDox's breach claim and were not at issue at trial, I cite to the summary-judgment order relaying the facts as background only.

[10] *Id.*

of [its] damages . . . ."[11]  PDS responded by removing the mark and adding the disclaimer to its website, then it claimed that because it had cured the breach, ProDox was not entitled to any liquidated damages under the settlement agreement.[12]

ProDox sued PDS for trademark infringement, unfair competition, bad faith, and breach of contract, seeking *inter alia*, "liquidated damages . . . for each instance" that PDS violated the settlement agreement.[13]  At summary judgment, I concluded that PDS had breached the settlement agreement and that the notice-and-cure clause in the agreement did not prevent ProDox from seeking damages under the liquidated-damages provision.[14]  In its response to ProDox's summary-judgment motion—and for the first time in this litigation—PDS also argued that the liquidated-damages provision is unenforceable because it constitutes a penalty under Nevada law.[15]  I ruled that the provision's language is facially valid but left open the possibility that PDS could show it was unenforceable if the stipulated damages were disproportionate to ProDox's actual damages.[16]  Several months later, ProDox abandoned all claims save for breach of contract with an amended complaint.[17]  In its answer to that amended complaint, PDS first pled the unenforceable-penalty defense.[18]

The November 14, 2023, bench trial was more attorney argument than evidence presentation.  PDS pushed its unenforceable-penalty defense and argued that ProDox needed to

---

[11] *Id.* at 4 (citations omitted).

[12] *See id.* at 7–9.

[13] ECF No. 1 at 9, ¶ B.

[14] *Id.* at 8–11.

[15] ECF No. 112 at 27.

[16] ECF No. 122 at 13–15.

[17] ECF No. 143.

[18] ECF No. 146.

prove that the liquidated damages it was seeking were consistent with its actual damages from PDS's violations of the settlement agreement.  ProDox responded with the testimony of its CEO Sparks showing that, at the time of contracting, the negotiated amounts in the provision were fair and reasonable in light of the loses he believed his company would sustain if PDS breached the agreement.[19]  ProDox also argued that PDS waived the unenforceable-penalty defense by waiting until summary judgment to raise it and not pleading it in response to the original complaint.[20]

Further confusion came from ProDox's failure to put on evidence of the number of PDS's violations of the settlement agreement so the court could calculate liquidated damages.  When ProDox abruptly rested its case without presenting this expected proof, it soon came to light that ProDox's counsel believed that the court had already ruled that ProDox was entitled to collect liquidated damages for a certain number of violations, so ProDox's counsel believed that all that was left to do was some math.  But that belief was unreasonable because I had denied summary judgment on contract-breach damages because "ProDox's proffered evidence [wa]s plagued with too many genuine disputes to permit me to summarily adjudicate damages."[21]  And I explicitly stated in that order that "[t]here thus remain too many questions of fact regarding the amount of liquidated damages that ProDox is owed, so I deny summary judgment on the element of damages for the contract breach."[22]  Nevertheless, I allowed PDS to reopen its case and call to the stand PDS's CEO Kyle Lum to attempt to establish the number of breaches so that liquidated damages could be calculated.

---

[19] ECF No. 169 at 47:11–25.

[20] *Id.* at 92:10–94:15.

[21] ECF No. 122 at 15.

[22] *Id.* at 16.

1        At the end of the bench trial, I ordered the parties to file post-trial briefs addressing three

2 questions:

3        1.     Did PDS waive its affirmative defense that the liquidated-damages provision is an

4 unenforceable penalty because it wasn't included in the original set of pleadings?

5        2.     Assuming that PDS didn't waive the defense, is the liquidated-damages provision

6 an unenforceable penalty?  I also asked the parties to clarify the burdens of proof and persuasion

7 for the unenforceable-penalty defense.

8        3.     Assuming that the liquidated-damages provision is enforceable, what evidence

9 should I base the liquidated-damages calculation on?[23]

**Findings of Fact and Conclusions of Law**

**I.    PDS waived its affirmative defense that the provision is an unenforceable penalty.**[24]

12        All parties agree that PDS raised its unenforceable-penalty defense for the first time in its

13 response to ProDox's summary-judgment motion.  That affirmative defense was not pled in

14 PDS's original answer and, as far this court can tell from its thorough review of the record, it was

15 not asserted at any other time until summary judgment.  ProDox asked PDS to explain the bases

16 for all of its affirmative defenses during discovery.  In response, PDS identified only its defense

17 that PDS's compliance with the settlement agreement's notice-and-cure provision precluded

18 ProDox from relying on the liquidated-damages provision.[25]

---

[23] *See* ECF No. 169 at 150:6–12.

[24] At trial, PDS took the position that this unenforceable-penalty theory was not an affirmative defense.  It abandoned that position in post-trial briefing and now concedes that it is.  ECF No. 173 at 6.

[25] Pl's Trial Ex. 4 at 6–9.

But after summary judgment, ProDox moved for leave to file an amended complaint to drop its trademark claims and proceed only on the issue of damages for its breach-of-contract claim.[26]  PDS filed an answer to that amended complaint and included its penalty defense there—for the first time in a responsive pleading.[27]  At that point, discovery had long since closed,[28] major aspects of the case had been adjudicated, and all that remained was a bench trial on damages.

PDS argues that its late-in-the-game pleading was permitted as a matter of course because it was in response to ProDox's amended complaint, shielding that defense from any further scrutiny.[29]  ProDox contends that a defendant can add affirmative defenses that late in litigation only if it can show that the plaintiff isn't prejudiced by the addition.  And it argues that it was prejudiced by PDS's eleventh-hour assertion because ProDox didn't seek discovery to address that defense and the window of opportunity to do so had closed years earlier.

"While state law defines the nature of [affirmative] defenses, the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs."[30]  FRCP 8 requires a defendant responding to a pleading to "affirmatively state any avoidance or affirmative defense" it has to a plaintiff's complaint.[31]  The Ninth Circuit has permitted

---

[26] ECF No. 128 (motion for leave to amend); ECF No. 142 (order granting leave to amend); ECF No. 143 (first-amended complaint).

[27] *See* ECF No. 146 at 8.

[28] *See* ECF No. 86 at 1 (noting that the "discovery cut-off date in this case was June 29, 2021").

[29] ECF No. 173 at 6–7.  Indeed, the only reason ProDox moved to amend its complaint was because PDS refused to stipulate to ProDox dropping those claims and then vigorously fought ProDox's attempt to drop them through amendment.  *See* ECF No. 128 at 4; ECF No. 130; ECF No. 131.

[30] *Healy Tibbitts Const. Co. v. Ins. Co. of N.A.*, 679 F.2d 803, 804 (9th Cir. 1982).

[31] Fed. R. Civ. P. 8(c).

defendants to raise affirmative defenses at the summary-judgment stage "whether or not it was

specifically pleaded as an affirmative defense, at least where no prejudice results to the

plaintiff."[32]  The plaintiff must "point to a tangible way in which it was prejudiced by the

delay."[33]  "The key to determining the sufficiency of pleading an affirmative defense is whether

it gives the plaintiff fair notice of the defense."[34]

### A.     PDS's attempts to avoid a prejudice analysis fail.

PDS first attempts to stop the court from conducting a prejudice analysis entirely,

essentially arguing that because PDS pled the penalty defense in an amended answer in response

to ProDox's amended complaint, no further analysis is needed.[35]  It cites FRCP 15(a)(3) to imply

that PDS was required to file a response to the amended complaint.[36]  It then declares that

"plaintiff's position that PDS waived an affirmative defense that it pled in its operative

responsive pleading is so novel (to put it generously) that there appears to be no case law where a

plaintiff has made this argument."[37]

Despite the conviction of its tone, PDS is just flat wrong.  Even a brief search reveals that

several courts in this circuit and throughout the country have evaluated whether and to what

extent a defendant can raise affirmative defenses in amended answers responding to a plaintiff's

amended complaint.  Most courts follow the "moderate approach" and hold "a defendant may

---

[32] *Healy Tibbitts*, 679 F.2d at 804; *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984) (noting that the Ninth Circuit "liberalized the requirement that affirmative defenses be raised in a defendant's initial pleading in" *Healy Tibbitts*).

[33] *Id.* (quoting *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997)).

[34] *Simmons v. Navajo Cnty, Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010), *overruling on other grounds recognized by Whitall v. Munk*, 2023 WL 4397949, at *1 (9th Cir. July 7, 2023).

[35] ECF No. 173 at 6.

[36] *Id.*

[37] *Id.* at 7.

file an amended answer without leave of court 'only when the amended complaint changes the theory or scope of the case, and then, the breadth of the changes in the amended response must reflect the breadth of changes in the amended complaint.'"[38]  Here, while ProDox's amended complaint changed the scope of the case in the sense that it narrowed it, it did not change the breach-of-contract claim in any material way, and PDS's addition of this affirmative defense did not respond to any new matter in ProDox's complaint.  So, under the moderate approach to amended answers, PDS should have moved for leave to add the defense but didn't.

PDS seeks to shift the blame for this pleading snafu to ProDox, arguing that the onus was on ProDox to file a motion to strike this rogue defense and, because it didn't, ProDox can't now argue waiver.[39]  PDS cites one California district-court case for the proposition that "[i]f a plaintiff objects to a defendant's affirmative defense, it is proper for that plaintiff to bring a motion to strike the affirmative defense."[40]  But that case doesn't hold that a motion to strike is the only method available to challenge a defendant's rogue affirmative defense, nor does it stand for the proposition that the failure to move to strike a late-raised defense bars a waiver challenge.

---

[38] *ImprimisRx, LLC v. OSRX, Inc.*, 2023 WL 2919318, at *2 (S.D. Cal. Apr. 12, 2023) (quoting *Coppola v. Smith*, 2015 WL 2127965, at *2 (E.D. Cal. May 6, 2015)); *see also, e.g., Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2020 WL 5239856, at *5 (C.D. Cal. Aug. 3, 2020) (noting that district courts in the Ninth Circuit "generally utilize" the moderate approach); *Grainger v. Ensley*, 2023 WL 2602492, at *3 (D. Or. Feb. 10, 2023) (noting that other district courts generally hold that "a defendant may not plead new counterallegations or affirmative defenses as of right unless the plaintiff's amendments changed the scope or theory of the case" and citing cases); *Seitz v. Envirotech Sys. Worldwide Inc.*, 2007 WL 1795678, at *2 (S.D. Tex. June 19, 2007) (noting that "most courts require leave to raise new allegations and defenses that go beyond responding to the new matters raised in the amended complaint" and citing cases); *Elite Ent., Inc. v. Khela Bros. Ent.*, 227 F.R.D. 444, 446 (E.D. Va. 2005) (same); *Synopsys, Inc. v. Magma Design Automation*, 2005 WL 8153035, at *3 (N.D. Cal. Oct. 19, 2005) (same).

[39] ECF No. 173 at 6–7.

[40] *Id.* (quoting *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 830 F. Supp. 2d 815, 825 (N.D. Cal. 2011)).

1    Plus FRCP 12(f)—the rule that governs motions to strike—expressly allows a court to "strike

2    from a pleading an insufficient defense" on its own; it need not wait for a plaintiff's motion to do

3    so, and it can choose to consider untimely motions to strike.[41]

4           So I do not conclude that PDS's affirmative defense is timely merely because it was

5    included in an amended answer filed in response to an amended complaint that didn't change the

6    scope of ProDox's breach-of-contract claim.  Nor is ProDox's failure to request pretrial that I

7    strike this defense fatal to its ability to argue waiver now.  So to best comport with the Ninth

8    Circuit's guidance on raising late affirmative defenses, and in the interest of justice, I consider

9    whether PDS's delay in asserting the defense prejudices ProDox and I find that it does.

10
11   **B.    *ProDox was prejudiced by PDS's delay in pleading the unenforceable-penalty
            defense.***

12          ProDox contends that it will be prejudiced if PDS's penalty defense is considered

13   because it lost the opportunity to request documents related to the financial statuses of the

14   companies in 2006 and depose PDS witnesses "who could have provided testimony regarding

15   the basis for the agreed upon liquidated damages amounts or who could have testified to the

16   financial value range for transactions at the time the parties agreed to the provision."[42]  ProDox

17   also would have sought more financial records from PDS for the period between 2006 and 2020

18   "for the purpose of demonstrating that the amounts per violation in the liquidated damages

19
20

---

21   [41] Fed. R. Civ. P. 12(f)(1); *see also Sprint Sols. Inc. v. Pac. Cellupage Inc.*, 2014 WL 12610204,
     at *2 (C.D. Cal. Dec. 17, 2014); 5C Wright & Miller, Federal Practice & Procedure, Civil § 1380
22   (3d. ed. 2004) ("The authority given by the court by [Rule 12(f)] to strike an insufficient defense
     'on its own' has been interpreted to allow the district court to consider untimely motions to strike
23   and to grant them if doing so seems proper.").

     [42] ECF No. 172 at 7.

provision were fair and reasonable."[43]  ProDox bases these prejudice arguments on the assumption that, to determine whether a liquidated-damages provision is an unenforceable penalty, the court would need to look at the intent of the parties at the time of drafting the provision rather than limit itself to the actual damages at the time of breach.[44]

While the Supreme Court of Nevada has not clearly articulated whether intent at the time of drafting is relevant to the penalty analysis, it has referenced intent when discussing whether the parties believed that any actual damages resulting from a breach would be difficult to ascertain when drafting.[45]  Other judges in this district have interpreted Nevada's unenforceable-penalty defense to require an analysis of what the parties assumed at the time of drafting about the amount of damages that may result from a breach.[46]  And the United States Supreme Court has generally stated that "the fact that the damages suffered are shown to be less than the damages contracted for is not fatal.  These provisions are to be judged as of the time of making the contract."[47]

---

[43] *Id.*

[44] *See id.* at 9.

[45] *See Mason v. Fakhimi*, 865 P.2d 333, 335–36 (Nev. 1993) (upholding liquidated-damages award that exceeded the actual loss sustained because it was not possible for the plaintiff "to accurately determine what actual damages would be in the event of a breach" at the time of drafting); *Tolboe v. Peccole*, 335 P.2d 77, 79 (Nev. 1959) (holding that liquidated-damages award was enforceable "considering the subject matter of the agreement[] and all the facts and circumstances under which the contract was made").

[46] *See Hubbard Bus. Plaza v. Lincoln Liberty Life Ins. Co.*, 649 F. Supp. 1310, 1315 (D. Nev. 1986) (citing *Silver Dollar Club v. Cosgriff Neon Co.*, 389 P.2d 923, 925 (Nev. 1964), for the proposition that "[t]he intention of the parties is the overall inquiry"); *Silver Dollar Club*, 389 P.3d at 925 (noting that a defendant's showing that the actual damages were smaller than the amount stipulated "could be regarded as an indication that the amount named was *intended* as a penalty").

[47] *Priebe & Sons v. U.S.*, 332 U.S. 407, 412 (1947).

I need not determine at this stage whether the parties' intent at drafting is a relevant consideration. What matters for our purposes is whether ProDox was prejudiced by not being able to assert its relevance during discovery to respond to PDS's objections to ProDox's requests for documents from 2006. The record establishes that ProDox consistently sought information from PDS from 2006 through 2020, and PDS steadfastly refused to provide it, arguing that anything that happened outside of the breach period (2017–2020) was irrelevant. Had ProDox been armed with the knowledge that PDS would rely on the penalty defense, it would have been able to press its arguments of that timeframe's relevance in motions to compel. Because PDS waited until after the close of discovery to reveal that it would rely on that defense, PDS was able to thwart ProDox's attempts to obtain discovery from 2006. So ProDox was prejudiced by this late pleading.

PDS's insistence that ProDox was not surprised or prejudiced is based largely on the assumption that the only information relevant to combat this penalty defense is whether the liquidated-damages calculations are proportionate to the actual damages ProDox sustained from the PDS's breaches.[48] And PDS maintains that because "evidence that [ProDox] suffered any damages caused by the alleged breach is an essential element of [its] breach-of-contract claim on which [ProDox] carries the burden of proof," ProDox should have sought that information anyway and would have been able to overcome the defense had it been able to prove actual damages.[49] There are several things wrong with this argument. First, as discussed *supra*, information about financial expectations and party intent at the time of drafting may be relevant

---

[48] *See* ECF No. 173 at 8–9.

[49] *Id.* at 8.

to the validity of the penalty defense.[50]  Second, while damages are a required element of a

breach claim, a valid liquidated-damages provision can supply those damages.  PDS offers no

Nevada case holding that a robust showing of actual damages is required to enforce a liquidated-

damages provision if the defendant doesn't challenge its enforceability, and in Nevada a

liquidated-damages provision is prima facie valid unless challenged.[51]  In other states that

similarly hold, courts do not require proof of actual damages absent that challenge.[52]  This makes

sense, given that the purpose of a liquidated-damages clause is to contract away from the

difficulties of proving actual damages.  And the Supreme Court of Nevada has positively cited

cases from other states endorsing the no-actual-damages-needed philosophy.[53]

    Nevada law also puts the burden of production *and* persuasion on the defendant to show

that liquidated damages are disproportionate to actual damages.  This structure lends further

---

[50] Indeed, ProDox argued this during trial in response to PDS's many objections to any information concerning 2006, and I overruled those objections.  ECF No. 169 at 26:14–27:6, 30:18–23, 37:7–21 (ProDox's counsel explaining the relevance of Sparks's testimony concerning why ProDox "decided to settle a case where the parties agreed that a certain amount would be considered liquidated damages" and "should be entitled to testify as to what at the time, when he signed this agreement, what he considered to be a reasonable and fair amount to determine what would be considered liquidated damages based on what he perceived his harm would be").

[51] *Haromy v. Sawyer*, 654 P.2d 1022, 1023 (Nev. 1982).

[52] *See e.g.*, *In re Bowles Sub Parcel A, LLC*, 792 F.3d 897, 901 (8th Cir. 2015) (interpreting Minnesota law and finding that "a contractual provision for liquidated damages can be enforced without proving actual damages" as long as "the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach" and the harm caused "is incapable or very difficult of accurate estimation"); *Slinski v. Bank of America, N.A.*, 981 F. Supp. 2d 19, 27 (D.D.C. 2013) (interpreting District of Columbia law and finding that no actual damages need to be proven as of the date of breach if "under the circumstances and expectations of the parties existing at the time of execution it appears that the provision is a reasonable protection against uncertain future litigation").

[53] *See Mason*, 865 P.2d at 336 (holding in the slightly different context of real-estate contracts that "[t]he provision for earnest money in a contract, in the absence of an express provision to the contrary, will be interpreted as a provision for liquidated damages and enforced without actual proof of damages being required") (quoting *Bamberg v. Griffin*, 394 N.E.2d 910, 914 (Ill. App. Ct. 1979)).

support to the notion that it was PDS, not ProDox, who had to produce evidence of disproportionate actual damages to prove that the provision is a penalty.[54]  ProDox thus would have had no reason to seek that information if it believed that its liquidated-damages provision would supply the damages calculation in this case.

Finally, ProDox did seek information about PDS's profits for the time of its breach, and PDS strenuously refused to provide it, arguing primarily that the information was irrelevant because the only damages ProDox could collect in this case stem from violations of the liquidated-damages clause.  At a discovery hearing in 2021, PDS defended its refusal to turn over financial records of its sales by arguing that they were irrelevant because only the liquidated damages specified in the agreement mattered:

> [T]here is a contract that governs the parties' legal relationship . . . and paragraph 5 says that [in the event of breach, ProDox is entitled to] $2,500 per violation, and for the first-time violation $15,000, which is really what this case is about.  In other words,

---

[54] *Silver Dollar Club*, 389 P.2d at 925 (noting that, "if [defendant] had introduced evidence showing that the actual damages were considerably smaller than the amount stipulated, this could be regarded as an indication that the amount named was intended as a penalty, but no such evidence was introduced" and citing McCormick on Damages § 157 (1935) for the proposition that "the defendant has the burden of proof (and doubtless this means the burden of first proceeding with evidence and also of finally persuading the judge) of the facts, such as disproportion, ease of estimating damages, or want of intent to pre-estimate, as he may count on to show that the stipulation is for a penalty"); *Loomis v. Lange Fin. Corp.*, 865 P.2d 1161, 1126 (Nev. 1993) (finding that the defendant "has not borne its burden of showing that the amount of actual damages is disproportionate to the amount of damages recovered under the liquidated damages clause" and thus the plaintiffs are entitled to recover the "liquidated damages as provided for in the purchase agreement").  PDS argues that only the burden of persuasion rests with the defendant.  ECF No. 173 at 18.  It cites the Supreme Court of Nevada's acknowledgement in *Haromy*, 654 P.2d at 1023, that "the challenging party must persuade the court" that a liquidated-damages award is disproportionate to the plaintiff's actual damages.  It also cites to *Prothera v. Ye*, 2020 WL 3073345, at *6 (D. Nev. June 10, 2020), an unpublished, non-binding opinion from another judge in this district, holding without analysis that the "applicable standard does not require [the] [d]efendant to present any evidence."  But *Haromy* doesn't clarify the burden of production for this defense, and *Prothera* doesn't address the binding Nevada precedent cited *supra*, which clearly states that both burdens fall on the defendant.

> we need look no further than the agreement itself, the parties
> contract[ed] what . . . the damages would be for a violation.  There
> is simply . . . no reason to go on a fishing expedition into my
> client's highly confidential financial records of a competitor when
> it has no legal significance to this case.  In other words, they're not
> getting disgorgement of profits, they're not getting actual damages.
> They are bound by the contract, and that's the damages they
> contracted for.[55]

PDS then went on to rely on a case noting that a court need not go further than a punitive-damages clause in a contract to determine damages, arguing that the same holds true for ProDox's liquidated-damages provision.[56]  It would be inequitable to now determine that ProDox has to overcome a defense that PDS so clearly did not advance earlier in the litigation, and particularly after PDS relied on the validity of the provision to avoid providing evidence of actual damages in the first place.

PDS relatedly argues that it "has consistently maintained throughout the course of litigation that [ProDox] suffered no damages" and thus put ProDox on notice that it should be prepared to prove actual damages.[57]  But PDS once again overstates the stance it's taken in this litigation.  What PDS has consistently maintained is that, when it cured one violation of the agreement by removing the ProDoc mark from its website, "there was therefore no 'violation' to trigger liquidated damages" under the settlement agreement.[58]  But arguing that the language of

---

[55] Audio recording of November 16, 2021, hearing before Magistrate Judge Koppe, 10:19:33 AM – 10:20:39 AM.  *See also* ECF No. 52 at 38 (PDS defending its refusal to turn over financial records because "even if [PDS] were in violation of the agreement, as [ProDox] alleges in the complaint the remedy provided under the agreement is $15,000 in the case of a first violation" and citing the liquidated-damages provision), 44 (noting its position that "the only damages stemming from this alleged breach are $15,000 in liquidated damages" to argue that ProDox was not entitled to discovery of PDS's customer lists or financial records).

[56] November 16, 2021, audio recording at 10:20:41–10:21:05.

[57] ECF No. 173 at 8.

[58] *Id.*

the notice-and-cure provision in the contract negates the ability to collect liquidated damages is materially different from claiming that ProDox can't prove actual damages or that the liquidated-damages provision itself is void.  PDS's attempt to equate those defenses is disingenuous at best, and PDS's notice-and-cure arguments didn't give ProDox fair notice of its penalty defense.

### C.   PDS's argument that it didn't know it needed to raise the defense until ProDox filed its summary-judgment motion is unconvincing.

PDS next blames its late assertion of the unenforceable-penalty defense on ProDox, stating that "as soon as [ProDox] made clear for the first time in its summary-judgment motion that it was claiming over 600 'violations' under the liquidated-damages clause, PDS asserted the penalty defense and argued it strenuously for the remainder of the litigation."[59]  But ProDox's damages theory was not a summary-judgment surprise.  ProDox consistently maintained since it sent PDS a demand letter in 2020 that it "consider[ed] any instance where PDS has solicited and obtained a customer outside of California as a separate violation of the agreement."[60]  During discovery, the parties argued over what evidence of PDS's business dealings outside of California ProDox could discover, and ProDox again stated its position that "every single one of" the sales PDS made outside of California under the ProDoc name "was a violation of the agreement that the liquidated-damages clause anticipated."[61]  The magistrate judge ultimately found that PDS was required to send a list of its customers, with a tally of each customer's

---

[59] *Id.* at 8–9.

[60] Pl's Trial Ex. 7.

[61] November 16, 2021, audio recording at 10:24:35–10:24:42; 10:25:10–10:25:36 (arguing that the liquidated-damages provision is concerned with the number of times PDS violated the agreement, not the amount PDS made on each violation, explaining that "if [PDS] sold . . . 100 jobs for a particular client . . . that's 100 violations of the agreement . . . and we are entitled to $2,500 times the number of violations").

unique transactions, for ProDox to use when calculating the number of violations under the liquidated-damages clause.[62]  And at PDS's CEO Kyle Lum's deposition, ProDox went through that list and had Lum identify every client that PDS serviced outside of California.[63]  It is thus uncontestable that PDS had been on notice of the magnitude of damages that ProDox was going to request long before the summary-judgment phase of this case.

To be sure, PDS made many attempts to downplay that magnitude.  At several points in the litigation, PDS ignored the allegations in the complaint and the demand letter to contend that the "only issue in this . . . case is whether [ProDox] is entitled to damages for . . . two perceived violations"[64] and refused to accept ProDox's repeated insistence that its case was not so limited.  But ProDox did not hide the method upon which it intended to calculate damages or that it considered each separate transaction to be a violation of the agreement.  So I reject PDS's notion that ProDox's summary-judgment request for $1.5 million dollars for 600 unique violations alerted PDS "for the first time" to the need to assert its unenforceable-penalty defense.

In short, PDS's failure to raise its penalty defense timely materially prejudiced ProDox because it prevented ProDox from obtaining discovery about actual damages and the circumstances as they were when the parties signed the 2006 settlement agreement.  Had ProDox known that it was required to defend the validity of the liquidated-damages clause, it may have been able to persuade the court that it was entitled to relevant discovery that PDS otherwise refused to provide.  I thus find that ProDox was prejudiced by PDS's failure to timely raise its

---

[62] ECF No. 64 at 6; November 16, 2021, audio recording at 10:34:53–10:35:14.

[63] *See* ECF No. 122 at 15 (discussing Lum's deposition testimony).

[64] *See* ECF No. 52 at 36 (discovery-dispute stipulation).

unenforceable-penalty defense, so PDS cannot rely on this defense to invalidate the liquidated-damages provision now.

## II.    ProDox proved that it is entitled to $217,500 in liquidated damages.

Having determined that the liquidated-damages clause is enforceable, I move to an analysis of what liquidated damages were proven at trial.  ProDox rested its case without introducing any evidence of damages stemming from PDS's violation of the settlement agreement to support a damages calculation under the liquidated-damages clause.[65]  ProDox then moved for judgment under FRCP 52(c) because PDS could not show that the liquidated-damages provision was unenforceable.[66]  In response, PDS argued that ProDox's failure to present any evidence of actual damages rendered any liquidated-damages award disproportionate to ProDox's proven actual damages of zero dollars.  ProDox's attorney explained that he interpreted my summary-judgment order to mean that ProDox had already proven 309 violations of the agreement, so it didn't need to adduce any further evidence than that.[67]  But, as I explained at trial, my summary-judgment order very clearly concluded that genuine issues of material fact prevented me from making any damages findings, and ProDox's interpretation that it did was an unreasonable interpretation of the order.[68]  Nevertheless, I ultimately gave ProDox 20 minutes to examine PDS's CEO Kyle Lum so it could provide evidence of the number of transactions that

---

[65] *See* ECF No. 169 at 82 (resting case after Sparks's testimony).

[66] *Id.* at 83–95.

[67] *Id.* at 113:14–22.

[68] *Id.* at 115:4–116:3, 126:21–22.

1  PDS made servicing customers outside of California in violation of the agreement.[69]  And I

2  reserved until now the decision on whether I would consider that late-introduced testimony.[70]

3

### A.   The court accepts and considers the evidence presented during ProDox's reopened case.

5  The decision to allow a party to reopen its case after it rests is within the sound discretion

6  of the trial judge.[71]  PDS asks that I exercise that discretion to disregard Lum's testimony

7  because ProDox's interpretation of my summary-judgment order was unreasonable.  The

8  erroneous interpretation was not malicious, nor does it indicate a bad-faith attempt to mislead the

9  court or the defense.  So in the interest of justice, I exercise my discretion to consider Lum's late-

10 introduced testimony.

11 But I do not grant ProDox's request that I also consider evidence from Lum's deposition,

12 provided long ago as an exhibit to ProDox's summary-judgment motion, to the extent that it

13 contradicts what Lum said at trial about which clients he serviced outside of California.  But

14 ProDox didn't bring Lum's deposition transcript to trial, and it had the opportunity to question

15 Lum on the stand and elicit his testimony.  To the extent that Lum's trial testimony was

16 inconsistent with his deposition testimony, ProDox's remedy was to impeach Lum with his

17 original deposition transcript.  But because ProDox didn't bring that transcript to trial,[72] that

18 couldn't happen.  So the only Lum testimony that I consider is his trial testimony.

19

20 _____

[69] *Id.* at 125:8–25.

21 [70] *Id.* at 125:9–11.

22 [71] *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 332 (1971); *Merritt-Chapman & Scott Corp v. Frazier*, 289 F.2d 849, 855 (9th Cir. 1961) ("Whether a case should be reopened for new testimony is peculiarly a matter within the discretion of the trial judge.") (cleaned up).

23 [72] ECF No. 169 at 143:17–145:6 (wherein the court notes, "there are procedures that we use when we do this at trial, and no one has complied with them.  And this is about the ninth thing

**B.     _Lum's trial testimony supports an award of $217,500 in liquidated damages._**

Lum's testimony established 81 violations of the settlement agreement.  ProDox elicited testimony from Lum showing that the company serviced three clients outside of California, which was prohibited by the agreement: ESIS; Hewson & Van Hellemont; and Rissman, Barrett, Hurt, Donahue, McClain, & Magnan, P.A.[73]  Lum also confirmed that each transaction listed for each of those clients on ProDox's exhibit list of transactions that PDS made between 2017 and 2020 represents "a transaction or an invoice for services done for . . . these firms that were outside [of] California for work [done] outside [of] California."[74]  That transaction list shows that PDS provided services for ESIS twice, Hewson 54 times, and Rissman 25 times.[75]  This evidence was uncontested.

The liquidated-damages provision in the 2006 settlement agreement is prima facie valid and enforceable.[76]  That provision obligates PDS to pay ProDox $15,000 for the first violation plus $2,500 for each subsequent one.[77]  Based on Lum's testimony at trial and PDS's concession that it violated the agreement when it used the ProDoc mark,[78] I conclude that PDS violated the

---

today that is noncompliant with trial procedures. . . . [W]hen you come to trial, you have to have . . . the depos that you plan to impeach with.").

[73] ECF No. 169 at 141:10–13 (ESIS), 142:22–23 (Hewson & Van Hellemont); 143:5–6 (Rissman);146: 5–8 (confirming that "Rissman, Hewson & Van Hellemont, [and] ESIS are the only firms that were serviced outside of California").  PDS argues that, because Lum first stated that Hewson may have been serviced from within California, I should disregard the conflicting testimony.  But ProDox rehabilitated Lum's testimony when it asked Lum to confirm that the three companies were serviced outside of California.

[74] _Id._ at 148:1–8.

[75] Pl's Trial Ex. 10.

[76] _See Haromy_, 654 P.2d at 1023.

[77] Pl's Trial Ex. 1 at 4.

[78] PDS has conceded this breach since the inception of this trial.  _See_ ECF No. 122 at 4–5 (discussing PDS's cure of the violation in 2020).

2006 settlement agreement 82 unique times.  The first violation occurred when PDS used the ProDoc name on its website from 2017–2020,[79] so, $15,000 is awarded for that first violation. And $202,500 is awarded for the remaining 81 violations—a separate violation for each sale serviced outside of California during the relevant time period—at $2,500 each.  I thus award ProDox a total of $217,500 in liquidated damages.

ProDox also seeks attorneys' fees that it contends it is entitled to under the settlement agreement, but it does not provide the evidence required under FRCP 54 and this district's local rules to permit me to evaluate the merits of that motion.  So I deny that request without prejudice to ProDox's ability to file a properly supported attorneys' fees motion.

### Conclusion

Based on these findings of fact and conclusions of law, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT **Plaintiff ProDox, LLC is entitled to judgment in its favor on its sole claim for breach of contract in the amount of $217,500.00**.

This order leaves no claims pending, so **the Clerk of Court is directed to ENTER FINAL JUDGMENT in favor of the plaintiff and against the defendant and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
March 19, 2024

---

[79] *See id.*